UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :    Chapter 13

LAROY G. DAVIS and                             :
HEDY P. DAVIS
              Debtor                           :    Bankruptcy No. 07-15486bf

.................................................

MEMORANDUM

.................................................

Before me is the trustee's objection to confirmation of the chapter 13

debtors' plan.  The trustee asserts that the proposed plan "violates 11 U.S.C. § 1325(b)(4)

in that it is not for applicable commitment period."  Trustee's Objection, ¶ 2.[1]  As will be

discussed, the debtors' proposed plan calls for 36 monthly payments.  The trustee

contends that only a 60 month plan can be confirmed.  The debtors reply that, since their

projected disposable income as prescribed by section 1325(b)(2) is negative, section

1325(b)(4) is inapplicable, and so their 36 month plan is permissible.

I determine this matter against the following undisputed factual

background.

---

[1]The trustee's objection also complained that the debtors' expenses were "excessive" and
their proposed plan payments should be greater.  The trustee withdrew this aspect of his
objection.  See Trustee's Posthearing Memorandum, at 2.

I.

The debtors, LaRoy and Hedy Davis, commenced a chapter 13 reorganization case on September 20, 2007. Along with their voluntary petition, the Davises filed Schedules I and J, disclosing their current income and expenses. Their total income of $8,889.63 at the time of their bankruptcy filing is derived from retirement pensions received by both debtors, a salary received by Mrs. Davis from a part-time job, and social security benefits received by Mr. Davis in the amount of $1,474 per month. The Davises' actual expenses at the time of their bankruptcy filing total $8,017.03, Schedule J, leaving a monthly net income of $872.60.

The Davises also filed a Chapter 13 Statement of Current Monthly Income, Official Form 22C.[2] Completing the current monthly income portion of this form, the Davises disclosed current monthly income of $7,815.82 (as social security benefits are not considered) or an annualized income of $93,789.84. As this income level exceeded the applicable median family income for the Davises' household size of two, they checked the box on Form 22C stating that "the applicable commitment period is 5 years."

Furthermore, since their current monthly income computation was above median, the Davises were required to fill out the remaining parts of Form 22C concerning expenses to determine their disposable income. Applying the expense methodology

---

[2]This form was formerly labeled "B22C."

found in section 707(b)(2), the debtors calculated a monthly disposable income of negative $19.77.

The Davises proposed a chapter 13 plan to pay their creditors $870 per month for a period of 36 months, for a total of $31,320. Since this proposed monthly amount is less than Mr. Davis's monthly social security payment, the debtors must be using a portion of his social security benefits to fund their plan. They anticipate that their plan payments will repay in full all bankruptcy counsel fees, the trustee's commission, a priority tax claim held by the IRS, a secured claim owed to the Bucks County Tax Claim Bureau, and the amounts needed to cure mortgage arrears on two of their three mortgages. In addition, their unsecured creditors are to receive a very modest dividend on a pro rata basis.[3]

An evidentiary hearing was held on the debtors' request to confirm their proposed 36 month plan. At that hearing the debtors confirmed information found on their bankruptcy schedules: that they both are retired teachers receiving pensions; that Mr. Davis also receives $1,474 per month in Social Security benefits; that Mrs. Davis supplements their income by working part-time, earning about $750 per month.

Both debtors have serious health problems and fear that their medical costs

---

[3]When the debtors' plan was first filed, it appeared that general unsecured creditors would receive about a 5% dividend, based upon the proofs of claim filed in this case. However, debtors' counsel has recently increased the fees she is charging in light of the trustee's objection to confirmation and the litigation that ensued. If additional counsel fees are allowed, the dividend to unsecured creditors, were the debtors' plan confirmed, will be reduced to less than 2%.

3

will increase in the future.  The debtors previously incurred large expenses in connection

with their now adult son.  Those expenses were paid by the proceeds of mortgage loans,

as well as by borrowing on various credit cards.  Even though the debtors withdrew funds

from their retirement accounts to pay some of these debts (indeed, Mrs. Davis testified

that their repayment to credit card companies over the years exceeded $150,000), they

still have substantial unsecured obligations.  The proof of claims docket reports about 25

filed general unsecured claims totaling $186,217.71.


II.


A.


Section 1322(a) lists four requirements for chapter 13 plan confirmation;

among them is payment in full to priority creditors (unless the creditor agrees to lesser

treatment).  See, e.g., In re Taylor, 81 F.3d 20, 23 (3d Cir. 1996) ("A bankruptcy court

may not confirm a Chapter 13 plan unless it provides for 'full payment . . . of all claims

entitled to priority under section 507' of the Code.").  Section 1325(a) identifies nine

additional confirmation provisions, including good faith, feasibility and the best interests

of creditors test (viz., creditors will receive distributions in chapter 13 at least equal to

those they would receive had the debtor filed a chapter 7 case).  See generally In re

4

Solomon, 67 F.3d 1128, 1132 (4th Cir. 1995).

Even if chapter 13 debtors meet their burden to demonstrate compliance

with the various provisions of sections 1322(a) and 1325(a), see generally In re Hill, 268

B.R. 548, 552 (B.A.P. 9th Cir. 2001) ("The debtor, as the chapter 13 plan proponent, has

the burden of proof on all elements of plan confirmation."), section 1325(b) states that if

the chapter 13 trustee or the holder of an allowed unsecured claim objects to confirmation

of the plan, then the court may not[4] approve the plan unless either:

> (A) the value of the property to be distributed under the plan
> on account of such claim is not less than the amount of such
> claim; or
>
> (B) the plan provides that all of the debtor's projected
> disposable income to be received in the applicable
> commitment period beginning on the date that the first
> payment is due under the plan will be applied to make
> payments to unsecured creditors under the plan.

11 U.S.C. § 1325(b)(1).

Section 1325(b)(1)(A) is applicable only when an unsecured creditor

objects to confirmation and the allowed claim of that particular creditor will not be paid

in full.  See 8 Collier on Bankruptcy, ¶ 1325.08[3] (15th ed. rev. 2008).[5]  That provision

is not germane in this contested matter as none of the unsecured creditors has opposed

---

[4]The Bankruptcy Code provides that "may not" is prohibitive, not permissive.  11 U.S.C.
§ 102(4).

[5]Because priority creditors must be paid in full under section 1322(a) unless they agree
otherwise, as a practical matter section 1325(b)(1)(A) will only concern non-priority, unsecured
creditors.

5

confirmation.

The trustee, however, has objected, thus triggering section 1325(b)(1)(B).
The trustee contends that the debtors' proposed 36 month plan does not provide for all of
their "projected disposable income to be received in the applicable commitment period"
and paid to their unsecured creditors. He insists that their plan must be 60 months in
duration.[6] The trustee does not raise any objections concerning sections 1322 or 1325(a).

Disposable income is defined "for purposes of this subsection" [i.e.,
subsection (b)] as "current monthly income received by the debtor," exclusive of child
support, foster care payments, and certain disability payments. 11 U.S.C. § 1325(b)(2).
The Bankruptcy Code defines "current monthly income" as the "average monthly income
. . . derived during the 6-month period" just prior to the debtor's filing. 11 U.S.C. §
101(10A)(A). Current monthly income also includes contributions to household expenses
made in some instances by non-debtor parties, but expressly excludes social security
benefits received by the debtor. 11 U.S.C. § 101(10A)(B).

In addition to current monthly income, disposable income excludes
"amounts reasonably necessary to be expended . . . for the maintenance or support of the
debtor or a dependent of the debtor or for a domestic support obligation," and charitable
contributions (with certain exclusions). 11 U.S.C. § 1325(b)(2)(A)(i), (ii). Furthermore,
if the debtor's income is above a median established for the family size of the debtor in

---

[6]As will be discussed later, he also insists—without citation to authority—that the
debtors' confirmed plan must include 60 monthly payments of $870.

6

the applicable state, as occurred in this case, the chapter 13 debtor must determine the

"amounts reasonably necessary to be expended" for expenses in accordance with section

707(b)(2)(A), (B).  11 U.S.C. § 1325(b)(3).  See, e.g., In re Brady, 361 B.R. 765, 771-72

(Bankr. D.N.J. 2007).

      To aid all parties in the calculation of disposable income in chapter 13

cases, Official Form 22C was promulgated, and Fed. R. Bankr. P. 1007(b)(6) [Interim][7]

directs that it be filed in all chapter 13 cases.  See, e.g., In re Kagenveama, 2008 WL

2485570, at *2 n.1 (9th Cir. 2008).  Part IV of Form 22C reflects the section 707(b)(2)

expense template for debtors with above median current monthly income, which allows

deduction of certain expenses consistent with national and local standards as established

by the IRS, as well as some of the debtor's actual expenses.  See, e.g., In re Frederickson,

375 B.R. 829, 831 (B.A.P. 8th Cir. 2007); In re Brady, 361 B.R. at 772 ("The deductible

expenses under subparagraphs (A) and (B) of section 707(b)(2) are based upon the

national and local standards for certain expenses as regulated by the IRS, plus the

debtors' actual expenses for specific categories of expenses.").  Thus, different

components make up income and expenses on Form 22C compared with bankruptcy

Schedules I and J.  See, e.g., In re Ross, 375 B.R. 437, 443 (Bankr. N.D. Ill. 2007)

---

      [7]In light of the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act
of 2005, and until official procedural rules are adopted under the Rules Enabling Act, the Judicial
Conference has recommended the adoption of "Interim" procedural rules.  See In re Kibbe, 361
B.R. 302 (B.A.P. 1st Cir. 2007).  This district has accepted that recommendation by order dated
October 5, 2005.  See Standing Order, Misc. No. 05-3008.

("Schedule J has no role in computing" disposable income under section 1325(b)); <u>In re</u>

<u>Brady</u>, 361 B.R. at 772 n.8.

Finally, section 1325(b)(4) provides, "for purposes of this subsection" [<u>i.e.</u>,

subsection (b)] a definition of the phrase "applicable commitment period" used in section

1325(b)(1).  For debtors with below-median current monthly income, the applicable

commitment period "shall be . . . 3 years" while for above-median debtors, the applicable

commitment period "shall be . . . not less than 5 years. . . ." 11 U.S.C. § 1325(b)(4)(A).[8]

The applicable commitment period may be less than three or five years "only if the plan

provides for payment in full of all allowed unsecured claims over a shorter period."  11

U.S.C. § 1325(b)(4)(B).

B.

The definition of "current monthly income" and "applicable commitment

period" found in the Code were added by the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 (BAPCPA).  Not added, but modified in 2005, was the

definition of disposable income, as well as the statutory designated recipient of the

debtor's projected disposable income.

Prior to BAPCPA, section 1325(b)(1) required that, upon objection by the

---

[8]Section 1322(d)(2) states that the maximum plan length is five years.

chapter 13 trustee, the debtor's plan must provide that all his disposable income be paid to the trustee for 36 months, see, e.g., In re Freeman, 86 F.3d 478 (6th Cir. 1996); In re Solomon, without requiring that this disposable income be distributed only to general unsecured creditors.  See, e.g., In re Brady, 361 B.R. at 772 n.8.  The disposable income "was to be used to make plan payments to cover administrative, secured, priority, and general unsecured claims."  In re Frederickson, 375 B.R. at 830.  Furthermore, disposable income was defined as income (without specified exclusions) less expenses reasonably needed for maintenance and support of the debtor and his dependents.

In practice, before enactment of  BAPCPA, disposable income was determined by examining the debtor's Schedule I, statement of income as of the date of his bankruptcy filing, and deducting the debtor's actual expenses as detailed on Schedule J, so long as those expenses were reasonably necessary for the debtor's maintenance and support.  See, e.g., id., at 830.

Under BAPCPA, certain income of the debtor, such as social security benefits, is no longer considered a component of disposable income.  Moreover, the income used to compute disposable income is an average of income received in the six months prior to the bankruptcy filing, rather than a snapshot of income as of the date of filing.  In addition, reasonable expenses, at least for above-median current monthly income chapter 13 debtors, involves a largely uniform approach, rather than relying solely upon reasonable actual expenses.  See, e.g., In re Brady, 361 B.R. at 772:

For above median income debtors, BAPCPA has supplanted
the pre-BAPCPA practice of assessing the reasonableness of
the debtors' actual expenses, as they are reflected in Schedule
J.  There is no discretion woven into the statute to substitute
the debtors' Schedule J expenses for the section 707(b)
standardized formula for the calculation of applicable and
actual expenses.  The amended Code now provides express
direction as to the particular expenses, and the amount of
those expenses, that can be deducted from the debtors' current
monthly income to calculate their "disposable income".

Furthermore, disposable income under BAPCPA is now directed

exclusively to pay non-priority unsecured creditors.  Thus, the present computation of

disposable income is likely to be only a component of a chapter 13 debtor's plan

payments, since the debtor must pay priority and administrative creditors, and will

typically also provide payment to secured creditors.  See In re Green, 378 B.R. 30, 33

(Bankr. N.D.N.Y. 2007).

As a result, after enactment of BAPCPA it is possible, as occurred here, for

chapter 13 debtors to have zero or negative disposable income, and yet have actual

income greater than actual expenses, and so have net income from which to fund a

chapter 13 plan.  Prior to BAPCPA, if a debtor's expenses exceeded income such that

there was no disposable income, confirmation would be thwarted by the feasibility

requirement of section 1325(a)(6).  See In re Alexander, 344 B.R. 742, 750 (Bankr.

E.D.N.C. 2006).  Indeed, as the Alexander court mused:

To veterans of Chapter 13 practice, it runs afoul of basic
principles to suggest that a debtor with no disposable income
can nonetheless propose a confirmable plan.  Yet BAPCPA

10

permits precisely that. Because the pre-BAPCPA definition
of "disposable income" calculated a real number rather than a
statutory artifact, it largely mirrored § 1322(a)(1)'s basic
requirement that the debtor have future earnings or income
"as is necessary for the execution of the plan." 11 U.S.C. §
1322(a)(1). Because disposable income largely took into
consideration all income and all expenses, a debtor with no
positive number simply had no means to fund the added costs
of a Chapter 13 plan. The result is different under BAPCPA.
For any number of reasons, because a debtor has income not
counted in the definition of current monthly income, has
housing or transportation expenses less than the permissible
IRS deductions, has huge secured debt for luxury items that,
bizarrely, may be deducted in full as a reasonable and
necessary expense, or wishes to continue to contribute to or
repay a loan to her 401(k) plan rather than pay her unsecured
creditors, a debtor under the new "disposable income" test
may show a zero or negative number, yet may be able to make
the required showing that she actually has enough income to
fund a confirmable plan. The debtor is at least entitled to try.

In re Alexander, 344 B.R. at 750.

C.

The changes made by BAPCPA to section 1325(b), as well as its new

definition of current monthly income, have led to a flurry of decisions concerning the

meaning of "projected disposable income" found in section 1325(b)(1)(B). As one court

observed:

BAPCPA, however, took the relatively simple application of
§ 1325(b) and rendered it a murky stew of conflicting judicial
opinions about the plain language meaning of common words
and phrases contained in the statute itself and the

11

Congressional intent behind it.

In re Green, 378 B.R. at 33.

In determining the proper methodology for calculating a chapter 13 debtor's "projected disposable income" found in section 1325(b)(1)(B), courts have rendered varying interpretations of the phrase, all while attempting in good faith to apply congressional intent as determined from the language of the statute itself. "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd— is to enforce it according to its terms." Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) (internal quotation omitted); see, e.g., Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004); United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989).

One group of decisions, consistent with the calculation of projected disposable income under the pre-BAPCPA version of section 1325(b), interprets this phrase as requiring bankruptcy courts simply to determine the debtor's disposable income as computed on Form 22C,  and then "project[] that sum into the future for the required duration of the plan."  In re Kagenveama, 2008 WL 2485570, at *3; see, e.g., In re Colclasure, 383 B.R. 463, 468 (Bankr. E.D. Ark. 2008);  In re Bardo, 379 B.R. 524 (Bankr. M.D. Pa. 2007); In re Alexander, 344 B.R. at 749.  Based upon this interpretation, the projected disposable income for debtors proposing a five year plan would be their disposable income as determined by Form 22C multiplied by 60.

12

A different group of decisions disagree with that methodology.  They focus on the word "projected" as modifying the term disposable income.  The section 1325(b)(2) definition of disposable income is based upon an income average for the six months prior to bankruptcy filing.  In the view of some courts, Congress intended projected income to refer to the debtor's future income, and thus the Form 22C calculation cannot be dispositive.  "Insofar as the term 'disposable income' demands a look back and the term 'projected' requires a look forward, the language is irreconcilable."  In re Kibbe, 361 B.R. at 312.  As observed by the Tenth Circuit Bankruptcy Appellate Panel:

> These cases typically reason that Congress's use of the term "projected" and the phrase "to be received by the debtor" in section 1325(b)(1)(B) indicates an intent that bankruptcy courts consider a debtor's future ability to pay in determining projected disposable income.  This result is based, in part, on the well-established principle of statutory construction that, when particular language is used in one part of a statute but not in another, Congress must have intended for that language to add meaning to the defined phrase.  Thus, these cases conclude that "projected disposable income" means something more than simply "disposable income."

In re Lanning, 380 B.R. 17, 22 (B.A.P. 10th Cir. 2007) (footnotes omitted).

Among those courts that do not consider a debtor's projected disposable income to be simply the Form 22C calculation multiplied by plan length, a number consider the Form 22C calculation only as "starting point" in determining projected disposable income:

13

> [W]e agree with the courts that have found "disposable
> income" to be only the starting point in determining
> "projected disposable income" under section 1325(b)(1)(B).
> Where it is shown that Form B22C disposable income fails
> accurately to predict a debtor's actual ability to fund a plan,
> that figure may be subject to modification.

Id., at 24-25; see, e.g., In re Grant, 364 B.R. 656, 667 (Bankr. E.D. Tenn. 2007).

Those courts considering the section 1325(b)(2) definition of disposable
income as relevant to the meaning of projected disposable income in section 1325(b)(1),
but not dispositive, place an evidentiary burden upon the party seeking to demonstrate
that a result different from the Form 22C calculation is appropriate, as though it were a
rebuttable presumption.  See, e.g., In re Lanning, 380 B.R. at 25; In re Briscoe, 374 B.R.
1, 19 (Bankr. D.D.C. 2007); In re Slusher, 359 B.R. 290, 297 (Bankr. D. Nev. 2007).  The
net income information found on bankruptcy Schedules I and J, however, generally is not
deemed sufficient by itself to override the Form 22C calculation, unless those bankruptcy
schedules reflect a "substantial change in the debtor's income and expenses between the
completion of Form B22C calculation and the consideration by the court of the objection
to confirmation."  In re Brady, 361 B.R. at 774;  see also, e.g., In re Orawsky, 387 B.R.
128, 153 (Bankr. E.D. Pa. 2008); In re Grant, 364 B.R. at 667.  Schedules I and J "only
provide a different snapshot of the debtors' financial circumstances at the time of the
filing of the petition, and do not reflect more accurately than any other formula the
debtors' anticipated income going forward during the Chapter 13 plan."  In re Brady, 361
B.R. at 774-75.

14

Those courts who decline to rely exclusively upon Form 22C for a determination of projected disposable income are concerned that in certain instances unfair results could occur, which results, they believe, Congress did not intend:

> Section 1325(b)(1)(B)'s use of the phrase "projected disposable income" raises the question of whether the calculation of disposable income for plan purposes should be based upon the debtor's average income for the six months prior to bankruptcy, or the debtor's projected income based upon her financial circumstances on the "effective date of the plan." In many cases, the answer will yield no difference; the debtor's projected income will be the same as her "current monthly income." However, a strict application of section 101(10A)'s definition of "current monthly income" can have serious consequence in some cases. For example, if "current monthly income" as defined in section 101(10A) applies, a debtor who anticipates a significant enhancement of future income is provided strong incentive to file chapter 13 as soon as possible. The amount of money that she would be required to commit to the plan would be based upon her lower average income prior to filing. On the other hand, a debtor who finds herself in the unfortunate circumstance of having a lower income after filing her petition might find that she is unable to confirm a plan because she cannot devote to the plan a "projected disposable income" predicated upon her prepetition income.
>
> The court believes that the term "projected disposable income" must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income. This conclusion is buttressed not only by the anomalous results that could occur by strictly adhering to section 101(10A)'s definition of "current monthly income," but because, taken as a whole, section 1325(b)(1) commands such a construction.

In re Hardacre, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006); see, e.g., In re Slusher, 359

B.R. at 298.

Conversely, those courts that have concluded that Congress intended that a

debtor's projected disposable income for above-median debtors is solely a multiplication

of the computation on Form 22C over the life of the chapter 13 plan are unpersuaded by

any concerns of unfairness in a particular instance.  They hold that Congress attempted to

render more uniform and less discretionary the calculation of disposable income.  Any

"undesirable results" that arise therefrom in a given instance stems from the uniform

policy choice made by Congress, to be altered by Congress and not by the courts.  See,

e.g., In re Kagenveama, 2008 WL 2485570, at *4; In re Musselman, 379 B.R. 583, 588

(Bankr. E.D.N.C. 2007); In re Nance, 371 B.R. 358, 367 (Bankr. S.D. Ill. 2007).

Furthermore, these courts also doubt that BAPCPA reflects a consistent

congressional theme to maximize unsecured creditor recovery at the expense of debtors:

> Similarly, the Court is not persuaded that the "clear" goal of
> BAPCPA was to "ensure that debtors repay creditors the
> maximum they can afford."  In re Zimmerman, 2007 WL
> 295452, at *8 (Bankr. N.D. Ohio 2007) (citing H.R. Rep. No.
> 109-31).  Congress excluded several sources of income from
> the disposable income calculation, including repayment of
> 401(k) loans and Social Security Act benefits, thereby calling
> into doubt whether maximum repayment to creditors was its
> main intent.  See In re Hanks, 362 B.R. 494, 500 (Bankr. D.
> Utah 2007) (questioning whether maximum repayment was
> the goal of BAPCPA).  Further, by focusing on repayment to
> creditors as Congress' ultimate goal, proponents of this
> approach ignore other potential competing goals of Congress
> under BAPCPA, particularly the desire to eliminate judicial
> discretion.  Id.  It is clear from the Chapter 7 means test, the
> adoption of standardized expense calculations for

16

> above-median debtors, and the calculation methods for
> determining "projected disposable income" that a major goal
> of Congress was to replace judicial discretion with specific
> statutory standards and formulas.

In re Nance, 371 B.R. at 366.

According to this analysis, if above median debtors have disposable income

after BAPCPA in amounts far less than their actual net income, courts have no power to

adjust that result.

D.


In this contested matter, the Davises argue as though the chapter 13 trustee

insists that their projected disposable income should be determined solely by reference to

their bankruptcy Schedules I and J, and not based upon the calculations found on their

Form 22C.  Debtors' Posthearing Memorandum, at 13.  But the trustee maintains that he

does not challenge the debtors' computation of disposable income.  Trustee's Posthearing

Memorandum, at 2.  Therefore, the trustee accepts that the Davises have negative

disposable income within the meaning of section 1325(b)(2).

Nonetheless, the trustee does maintain that the debtors' schedules and

proposed plan "have clearly shown availability of projected disposable income of $870

per month."  Id., at 5.  He also asserts that a proposed chapter 13 plan that commits social

security income as a funding source "ma[kes] moot the issue of whether it should or not

17

be considered disposable income." Id., at 1.

To the extent that the chapter 13 trustee is now suggesting that projected disposable income for purposes of section 1325(b)(1) must be computed in this chapter 13 case from the Davises' Schedules I and J, as would have occurred under the pre-2005 version of the Code, I find that position unpersuasive.  See, e.g., In re Orawsky, 387 B.R. at 154:

> The Trustee has not challenged the accuracy of the Debtor's calculation of PDI [projected disposable income] on Form 22C.  Nor has the Trustee produced any evidence of a change in income or expenses that formed the basis of the PDI calculation under 11 U.S.C. § 1325(b)(2) and (3) as set forth on Form 22C. The Trustee bases his view that the Debtor's PDI is $317.00 per month solely on the facts that: (1) the Debtor has proposed to commit to the Plan more than the PDI calculated in her Form 22C and (2) her Schedules I and J show the existence of net monthly income of $317.00 (once the Debtor's student loan payments are subtracted from the listed expenses).
>
> I find the Trustee's methodology to be inconsistent with § 1325(b)(3).  More than the mere consideration of Schedules I and J is required to modify the determination of PDI for above median debtors statutorily mandated by § 1325(b)(2) and (3) as implemented through Form 22C.  If the existence of net monthly income in Schedules I and J, by itself, were determinative of PDI for above-median chapter 13 debtors, the elaborate statutory means test methodology for determining PDI required by § 1325(b)(3), commonly viewed as the cornerstone of the BAPCPA reforms, would be nullified.  For this reason, to the extent that the Trustee argues that Schedules I and J demonstrate that the Debtor's PDI is $317.00 per month, I reject that position as a matter of law.
>
> I also find unpersuasive the trustee's position that a chapter 13 debtor's

18

proposed use of social security income—or any income exempt from the statutory definition of current monthly income—as a plan funding source waives that exemption from the computation of projected disposable income.  That contention overlooks that section 1325(b), as amended by BAPCPA, is concerned solely with the amounts due general unsecured creditors.  If a chapter 13 debtor proposes to repay secured, administrative and priority creditors with exempt social security income, such a proposal does not require that those funds also be paid to unsecured creditors.

For purposes of this contested matter, I need not resolve whether the congressional decision to amend section 1325(b) in 2005—which inter alia, altered the purpose of that subsection—along with the new definition of disposable income in section 1325(b) and the pre-BAPCPA practice of computing projected disposable income as a function of disposable income requires that the determination of projected disposable income for above-median debtors be derived solely from Form 22C; or whether the pre-BAPCPA practice of relying upon actual net income, coupled with the use of the modifier "projected," limits the Form 22C computation only to a rebuttable presumption.  Even if Congress intended that the result on Form 22C be rebuttable for above-median chapter 13 debtors, the trustee in this instance offered no rebuttal evidence.  There was no evidence offered that the debtors' pre-bankruptcy average income and expenses have improved recently in any material aspect.[9]

---

[9]On the contrary, such evidence as was offered suggests that the debtors' actual medical expenses may soon increase.

19

Accordingly, I agree with the debtors that they have negative disposable income as well as zero projected disposable income, regardless of the length of their chapter 13 plan. See, e.g., In re Kagenveama, 2008 WL 2485570, at *4; In re Alexander, 344 B.R. at 750. As such, they are under no statutory obligation to pay their general unsecured creditors any minimum monthly sum. See, e.g., In re Brady, 361 B.R. at 775.[10]

III.

A.

The primary issue posed by the trustee's objection, and which issue has been decided in differing ways by dozens of courts since BAPCPA was enacted, see generally In re Rush, 387 B.R. 26 (Bankr. W.D. Mo. 2008), concerns the concept of an applicable commitment period as defined in section 1325(b)(4), when an above-median income debtor has no projected disposable income. The trustee maintains that the plain meaning of paragraphs (1) and (4) of section 1325(b) requires, upon objection by a trustee, that all chapter 13 plans proposed by debtors whose current monthly income is above median be 60 months in duration, unless the plan proposes to repay unsecured

---

[10]Since these debtors have no projected disposable income, I need not decide whether section 1325(b)(1)(B) excludes administrative claimants from those receiving a dividend from such income. See In re Amato, 366 B.R. 348 (Bankr. D.N.J. 2007).

20

creditors in full.

Viewed slightly differently, the Davises have proposed a chapter 13 plan that would have met all of the requirements of the pre-BAPCPA version of section 1325(b). They are offering to pay their creditors all of their net income (defined as actual income less actual reasonable expenses) for a period of 36 months. The trustee argues, however, that the current version of section 1325(b) significantly altered pre-BAPCPA practice. According to the trustee, Congress now requires the Davises to tender those monthly payments for 60 months, regardless of their lack of any disposable income, because they have current monthly income that exceeds the median level. As will be seen, some courts support the trustee's position.

The debtors counter that Congress did not require them to propose a 60 month plan because they have no projected disposable income, and so their general unsecured creditors are not statutorily entitled to receive any dividend. In other words, the debtors maintain that Congress did not mandate any fixed plan length in chapter 13 cases where general unsecured creditors are not entitled under section 1325(b)(1) to receive any minimum monthly amount. There also are reported decisions that uphold the debtors' contention.

As noted above, section 1325(b)(4)(A) defines the phrase "applicable commitment period" as three years for debtors whose current monthly income is below median and five years for debtors whose current monthly income is above median.

21

Section 1325(b)(4)(B) adds that the applicable commitment period can be less than three

or five years, "but only if the plan provides for payment in full of all allowed unsecured

claims over a shorter period."  Here, there is no dispute that the debtors' proposed plan

would not pay unsecured creditors in full.[11]

As with the meaning of projected disposable income, courts have struggled

to apply the new definition of applicable commitment period in a manner consistent with

congressional intent as determined by the plain language of the statute.  A few courts

construe section 1325(b)(1) and (b)(4) as fixing only the total amount to be paid to

allowed unsecured claims, without requiring a mandatory plan length.  In that regard, the

applicable commitment period as defined by section 1325(b)(4) is considered solely as a

multiplier of a debtor's projected monthly income under section 1325(b)(1) to yield the

total amount due general unsecured creditors.  See In re Fuger, 347 B.R. 94, 95 (Bankr.

D. Utah 2006) ("The Court determines that the term 'applicable commitment period'

requires the Debtors only to commit to a specific return to unsecured creditors, not to a

specific period of time."); In re Swan, 368 B.R. 12 (Bankr. N.D. Cal. 2007); see also

Lundin, Chapter 13 Bankruptcy, § 500.1 (3d ed. 2006).

In support of this statutory interpretation, reference is sometimes made to

BAPCPA's 2005 amendments to the confirmation requirements for chapter 11

---

[11]One bankruptcy court has concluded that payment in full under section 1325(b)(4)(B)
does not require interest on allowed unsecured claims, consistent with section 502(b)(2).  In re
Ross, 375 B.R. 437, 444 (Bankr. N.D. Ill. 2007).

22

reorganization plans proposed by individual debtors.  See generally In re Frederickson, 375 B.R. at 834.  Section 1129(a)(15) now provides that when a holder of an allowed unsecured claim objects to confirmation, the debtor's plan can be confirmed so long as it provides "the value" of the debtor's disposable income, as defined by section 1325(b)(2), over a five year period.  To the extent that BAPCPA now requires individuals in chapter 11 cases to pay only the value of disposable income projected over a five year period, without mandating a fixed term for such chapter 11 plans, some have reasoned that Congress intended a similar result in chapter 13 cases: viz., debtors need to pay unsecured creditors the value of their projected disposable income over the applicable commitment period in their chapter 13 plan, but there is no mandatory length to the plan.  Otherwise, debtors who desire to repay creditors sooner would simply convert from chapter 13 to chapter 11.  See Haines, Chapter 11 May Resolve Some Chapter 13 Issues, 8 Norton Bankr. L. Adviser 1 (Aug. 2007).[12]

Support for the multiplication approach also is found in two policy arguments.  First, given the time value of money, it is beneficial to unsecured creditors to receive the amounts due them as soon as possible, as they receive no postpetition interest.  Congress would not have intended to preclude that benefit if debtors could afford to do so.  See In re Swan, 368 B.R. at 24, 26.  Second, the longer the plan length, the greater the opportunity for a chapter 13 debtor to default.  Thus, in allowing earlier repayment in full,

---

[12]This reasoning may not take into account the creditor class voting requirements in chapter 11 cases, which requirements do not exist in chapter 13 cases.

Congress was increasing the opportunity for debtors to receive a bankruptcy discharge and a fresh start: one of the underlying purposes of the Bankruptcy Code.  <u>See</u>, <u>e.g.</u>, <u>id.</u>, 368 B.R. at 24-26.

A greater number of courts reject the conclusion that section 1325(b) fixes only an amount to be paid to unsecured creditors and not a minimum plan length.  Those courts hold that section 1325(b)(4) mandates a minimum plan length whenever a trustee objects to confirmation and unsecured creditors are not being paid in full, whether or not the debtor has any projected disposable income.  These decisions are based upon a perceived plain meaning of section 1325(b)(4), which is considered a temporal requirement.  <u>See</u>, <u>e.g.</u>, <u>In re Nance</u>, 371 B.R. at 369; <u>In re Grant</u>, 364 B.R. at 667; <u>In re Slusher</u>, 359 B.R. at 301-02.

Thus, according to some courts, upon objection by the chapter 13 trustee, section 1325(b) now requires that a debtor's plan must extend either three or five years, depending only upon whether her current monthly income is above or below the applicable median income, unless the debtor's proposed plan pays all unsecured creditors in full.  <u>See</u>, <u>e.g.</u>, <u>In re Fridley</u>, 380 B.R. 538 (B.A.P. 9th Cir. 2007); <u>In re Heyward</u>, 386 B.R. 919 (Bankr. S.D. Ga. 2008); <u>In re Luton</u>, 363 B.R. 96 (Bankr. W.D. Ark. 2007); <u>In re Slusher</u>, 359 B.R. at 304; <u>In re Davis</u>, 348 B.R. 449 (Bankr. E.D. Mich. 2006).  This result follows even if the debtor's projected disposable income is zero or negative.  <u>See</u>, <u>e.g.</u>, <u>In re Colclasure</u>; <u>In re Nance</u>, 371 B.R. at 371; <u>In re Musselman</u>, 379 B.R. at 594; <u>In</u>

24

re Grant, 364 B.R. at 667 (current monthly income, i.e., relation to median income,

determines applicable commitment period without consideration of projected disposable

income); In re Casey, 356 B.R. 519, 527 (Bankr. E.D. Wash. 2006) (the existence of

projected disposable income is irrelevant to the utilization of the plan length definitions in

section 1325(b)(4)); In re Davis, 348 B.R. at 458.[13]

In addition to the language of section 1325(b)(4), there are a variety of

reasons offered in support of this interpretation that BAPCPA established a mandatory

plan length based solely upon current monthly income.

First, these decisions all emphasize that the term "period" as well as the

term "commitment" refer to a length of time. See, e.g., In re Davis, 348 B.R. at 456.

When Congress intended to use a term as a multiplier it expressly so stated, such as in 11

U.S.C. §§ 707(b)(2) and 1325(b)(3). See, e.g., In re Pohl, 2007 WL 1452019, at *3

(Bankr. D. Kan. 2007); In re Davis, 348 B.R. at 456. Second, these courts observe that

there was a three year minimum plan length in pre-BAPCPA section 1325(b), and they

find no indicia that Congress intended to change the mandatory length construct when it

amended that subsection in 2005. See, e.g., In re Nance, 371 B.R. at 370; In re Davis,

---

[13]The trustee in this dispute assumes that if the Davises are obligated to confirm a five
year plan instead of a three year plan, that five year plan must call for 60 monthly payments of
$870, instead of 60 monthly payments of $522. ($522 x 60 = $870 x 36). The trustee cites no
decision for this contention, and it was expressly rejected in In re Dalton, 2007 WL 4554024, at
*5 (Bankr. S.D. Miss. 2007). The Dalton court confirmed an amended chapter 13 plan over the
objection of the trustee. The plan amendment extended the proposed plan from 56 months to 60
months, but the sum of the payments remained the same despite the trustee's protest in that case.

348 B.R. at 457; In re Schanuth, 342 B.R. 601, 608 (Bankr. W.D. Mo. 2006).

Third, the fixed plan length decisions often refer to BAPCPA's legislative

history, which states in relevant part:

> Section 318 of the Act amends Bankruptcy Code sections
> 1322(d) and 1325(b) to specify that a chapter 13 plan may not
> provide for payments over a period that is not less than five
> years if the current monthly income of the debtor and debtor's
> spouse combined exceeds certain monetary thresholds.

H.R. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. at 79 (2005); see, e.g., In re Nance,

371 B.R. at 371.

Fourth, decisions holding that section 1325(b) establishes a mandatory plan

length regardless of projected disposable income often note two related policy arguments

supporting this result.  They observe that a mandatory plan length allows trustees and

unsecured creditors additional time to monitor the debtor's financial circumstances.  If the

debtor's income increases or expenses decrease, then they may seek a post-confirmation

modification of the debtor's plan pursuant to section 1329(a).  Evidence of congressional

desire to monitor future financial developments is found in the statutory requirements that

debtors file certain amendments under section 521(a)(1)(vi) (changes in Schedules I and

J) and (f)(1) (future annual tax returns).  See, e.g., In re Nance, 371 B.R. at 371; In re

Davis, 348 B.R. at 458.

Similarly, at least one court concluded that a fixed minimum plan length

would support a congressional desire for fiscal discipline to be imposed upon all chapter

13 debtors over a meaningful period of time.  If the debtor could terminate a plan earlier

than the time set forth in section 1325(b)(4), such fiscal discipline could be unduly

shortened.  See In re Pohl, 2007 WL 1452019, at *4.

All the above arguments have proven unpersuasive to other courts, a

number of which have concluded that, although the applicable commitment period is not

merely a multiplier of projected disposable income, there nonetheless is no applicable

commitment period unless the debtor has positive projected disposable income.  See, e.g.,

In re Kagenveama, 2008 WL 2485570, at *7; In re Green, 378 B.R. at 39; In re Brady,

361 B.R. at 777; In re Alexander, 344 B.R. at 752.  In other words, these decisions hold

that, even if the multiplier construct to section 1325(b) is incorrect, when a chapter 13

debtor has no obligation to pay any dividends to unsecured creditors then section

1325(b)(4) has no application.

In reaching this interpretation, these courts emphasize the dependent

relationship of section 1325(b)(4) to section 1325(b)(1), as expressly stated in the statute.

They also find significant that section 1322(d) contains provisions regarding the length of

chapter 13 plans.  Had Congress intended to mandate plan lengths based upon current

monthly income and without regard to the existence of projected disposable income, it

could have amended this subsection to so provide.  See, e.g., In re Frederickson, 375 B.R.

at 835.

Moreover, those courts holding that the concept of an applicable

27

commitment period has no relevance when a chapter 13 debtor has no projected

disposable income often emphasize that the purpose of section 1325(b) was significantly

altered by BAPCPA.  Subsection (b) no longer is designed to insure payments of actual

net income to all creditors; it is now focused on providing a complicated and formulaic

calculation of disposable income to general unsecured creditors.  See, e.g., In re

Frederickson, 375 B.R. at 835.  Thus, these courts consider that any reliance upon the

Code's insistence on three year plans in former section 1325(b) is misplaced.


B.


The dispute over the proper length of a chapter 13 plan upon trustee or

unsecured creditor objection, triggering section 1325(b), is sometimes referred to as

deciding between whether Congress established a monetary or temporal requirement in

favor of unsecured creditors.  See, e.g., In re Swan, 368 B.R. at 23.  When there is no

projected disposable income, however, I find that determining whether Congress intended

to require chapter 13 debtors to repay unsecured creditors over a fixed period of time or

simply a fixed amount is not necessary.

Section 1325(b)(4), which begins with the phrase "For purposes of this

subsection," expressly declares that its definitions of applicable commitment period are

relevant only in the context of section 1325(b)(1).  Although the definition of applicable

28

commitment period may be considered temporal, I am persuaded that Congress did not

intend section 1325(b)(4) to have any application when a chapter 13 debtor has no

projected disposable income to distribute to his general unsecured creditors. See, e.g., In

re Frederickson, 375 B.R. at 835; In re Brady, 361 B.R. at 776-77; In re Alexander, 344

B.R. at 751. If there is no projected disposable income, there is no applicable

commitment period because the chapter 13 debtor has no obligation under section

1325(b)(1).

> As recently held by the Ninth Circuit Court of Appeals:
>
> There is no language in the Bankruptcy Code that requires all
> plans to be held open for the "applicable commitment period."
> Section 1325(b)(4) does not contain a freestanding plan
> length requirement; rather, its exclusive purpose is to define
> "applicable commitment period" for purposes of the §
> 1325(b)(1)(B) calculation. Subsection (b)(4) states "For
> purposes of this subsection, the 'applicable commitment
> period' . . . shall be . . . not less than 5 years" for
> above-median debtors. Subsection (b)(1)(B) states that "the
> debtor's 'projected disposable income' to be received in the
> 'applicable commitment period' . . . will be applied to make
> payments under the plan." When read together, only
> "projected disposable income" has to be paid out over the
> "applicable commitment period." When there is no
> "projected disposable income," there is no "applicable
> commitment period."

In re Kagenveama, 2008 WL 2485570, at *6.

> While I appreciate some of the policy arguments made by those courts who

apply section 1325(b)(4) without regard for the existence of projected disposable income,

especially the issue of continued debtor oversight, some of the counter policy arguments,

such as prompt payments from chapter 13 debtors and encouraging debtor fresh starts,

have at least equal force.  Policy issues aside, I am persuaded that the language of section

1325(b), as a whole, supports the position that Congress intended to trigger the

application of section 1325(b)(4) only when section 1325(b)(1) is meaningful.  Thus, I

agree with those courts that hold that there is no applicable commitment period for

chapter 13 debtors that have no projected disposable income.

      This interpretation avoids the following incongruous result.

      If, in an unusual circumstance, a debtor had no unsecured creditors at the

time of his chapter 13 bankruptcy filing, Congress could not have intended that a trustee

could properly object to confirmation of a less than 60 month plan, even if the debtor had

above-median current monthly income and even if the debtor's Form 22C reflected

positive disposable income.  See generally In re Green, 378 B.R. at 34-35.

      An application of section 1325(b)(4) divorced from section 1325(b)(1)

theoretically would allow a trustee to force such a debtor to remain in chapter 13 for five

years, even though the absence of unsecured creditors would preclude any distribution of

disposable income.  A trustee might argue that section 1305(a) allows the possibility that

general unsecured claims may arise postpetition, see generally In re Yelverton, 2006 WL

3804680 (Bankr. D.D.C. 2006); In re Perkins, 304 B.R. 477 (Bankr. N.D. Ala. 2004); In

re Jagours, 236 B.R. 616 (Bankr. E.D. Tex. 1999), and so chapter 13 debtors should

tender 60 months of plan payments in order to allow for the modification of their plans in

the event such contingency occurred.

It is highly unlikely, though, that Congress intended to compel 60 month

plans where there are no then-existing unsecured creditors when it amended section

1325(b) in 2005, given the negative consequences to existing non-unsecured creditors

from delayed payments as well as the continuation of an injunction against their

collection activities, and the negative consequences to chapter 13 debtors from a delay in

receiving a fresh start.

Similarly, when a chapter 13 debtor has no projected disposable income,

Congress did not intend to allow a trustee to compel a five year plan simply because there

is a possibility, however remote, that the debtor's financial circumstances may change

significantly and a post-confirmation plan modification may be sought.  The same

negative consequences would result.[14]

Furthermore, those decisions that justify imposing a five year plan

requirement because section 1329(a) allows trustees and unsecured creditors the

opportunity to seek post-confirmation modification of chapter 13 plans overlook certain

countervailing arguments surrounding reliance upon section 1329 in construing

---

[14]Indeed, the debtors in this dispute are retirees whose income is primarily derived from pensions and social security benefits.  Unfortunately, individuals receiving income from such sources are, in general, more likely to face significantly greater expenses in the future than significantly greater income.  Although Congress seems to have favored such debtors by excluding their social security benefits from the calculation of current monthly income, the trustee implicitly contends, unpersuasively, that Congress also intended trustee oversight of their finances for five years.

31

congressional intent regarding section 1325(b).

For example, BAPCPA's amendment to section 1329(b), governing post-confirmation modification of chapter 13 plans, does not contain any express reference to section 1325(b), but does to section 1325(a).  The pre-BAPCPA version also expressly incorporated the provisions of section 1325(a) but not section 1325(b).  In applying section 1329 as it existed before its amendment in 2005, some courts, noting the lack of incorporation of section 1325(b) by section 1329, permitted chapter 13 debtors to pay their projected disposable income in full and in less than three years, despite the provisions of section 1325(b).  See, e.g., In re Sunahara, 326 B.R. 768 (B.A.P. 9th Cir. 2005); In re McCollum, 363 B.R. 789 (E.D. La. 2007); In re Turek, 346 B.R. 350, 358-59 (Bankr. M.D. Pa. 2006); In re Mangum, 343 B.R. 185 (Bankr. N.D. Ill. 2006); In re Miller, 325 B.R. 539 (Bankr. W.D. Pa. 2005); see also In re Martin, 232 B.R. 29, 37 (Bankr. D. Mass. 1999) (holding that although section 1325(b) was implicitly incorporated by section 1329, debtors can tender projected disposable income in full in less than a three year period).  To the extent that section 1329 was not altered by BAPCPA in this regard, those earlier decisions, if correct, weaken any argument that section 1325(b) was intended to impose a fixed plan length on all debtors, even those without any projected disposable income, if there is no similar requirement concerning post-confirmation plan modifications.[15]

---

[15]I appreciate that, by virtue of section 1329(b), a plan modification must meet the good faith requirement of section 1325(a)(3).  However, unless a modified plan is required to have

32

Furthermore, if projected disposable income is simply a function of disposable income as computed on Form 22C, the calculation of disposable income on Form 22C is based solely upon pre-bankruptcy income. Therefore, even were section 1329 held implicitly to incorporate present section 1325(b), a post-confirmation increase in actual income would have no effect upon the chapter 13 debtor's obligation to its unsecured creditors, as such an increase would not alter a debtor's projected disposable income. If so, then a trustee-requested plan modification under section 1329(a), based upon the debtor's material increase in net income, may not be permissible.[16]

Neither the Davises nor the trustee is seeking a plan modification under section 1329. Thus, the proper interpretation of this statutory provision is not before me. See In re Green, 378 B.R. at 39 n.11 (declining to speculate whether section 1329 incorporates section 1325(b) and, if not, the effect of that omission). The above observations are merely intended to note some of the difficulties in using the provisions of section 1329 to justify imposing a mandatory 60 month plan length requirement on above-median chapter 13 debtors regardless of the existence of projected disposable income. Moreover, even if one accepts that a significant increase in actual income or a

---

some minimum plan length, then proposing an early repayment to creditors the amounts due them under the terms of a confirmed plan may be considered as in good faith.

[16]A chapter 13 trustee made such an argument in In re Hall, 2008 WL 2388628 (Bankr. N.D. Ohio 2008), in opposing the debtor's motion to modify her confirmed chapter 13 plan due to a significant reduction in actual income. The court in Hall concluded that section 1325(b) was not applicable, overruled the trustee's objection and approved the modified plan. Nevertheless, the court noted that the trustee's objection was "plausible." Id., at *2.

33

significant decrease in actual expenses permits a trustee to modify a debtor's confirmed

chapter 13 plan, see In re Kagenveama, 2008 WL 2485570, at *7; In re Musselman, 379

B.R. at 594, it is reasonable for Congress to have limited that modification opportunity,

where there is no projected disposable income, to any plan proposed by a debtor that

meets all of the requirements of sections 1322(a) and 1325(a).  Indeed, as a number of

courts have observed, if Congress had intended to mandate the minimum chapter 13 plan

length without regard to whether a debtor had unsecured creditors or projected disposable

income, it could have easily amended section 1322(d) to so state.  See, e.g., In re Green,

378 B.R. at 35.

        In sum, whether a chapter 13 debtor who has above median current monthly

income as well as positive projected disposable income must propose a 60 month plan

upon the objection of a trustee is an issue I need not decide on these facts.  Compare In re

Liverman, 383 B.R. 604, 614 & n.18 (Bankr. D.N.J. 2008) (distinguishing between

debtors with positive and negative projected disposable income in applying section

1325(b)).  Here, the Davises have no projected disposable income.  In this circumstance,

the trustee's insistence upon a 60 month plan (and his assertion that the debtors must pay

unsecured creditors almost $20,000[17]) is not persuasive.

        For these reasons, the trustee's objection to confirmation shall be overruled.

_____

        [17]If the Davises were statutorily obligated to pay $870 per month for an additional 24
months, as the trustee contends, then they would be tendering an extra $20,880.  All of those
additional payments would be distributed in this instance to unsecured creditors, less a trustee's
commission, even though the debtors have no projected disposable income.

An appropriate order will be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: July 22, 2008